1

2

3

4

5

6

7

8         **IN THE UNITED STATES DISTRICT COURT**

9         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  GUY SHELBY,                              No. CIV S-08-0362-CMK

12              Plaintiff,

13        vs.                                <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,

15              Defendant.

16  _____/

17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 26) and defendant's cross-

23  motion for summary judgment (Doc. 29).

24  / / /

25  / / /

26  / / /

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on December 2, 2004.  In the application, plaintiff claims that disability began on January 13, 2002.  Plaintiff claims that disability is caused by a combination of: "cervical, thoracic, and lumbar degenerative disc disease; right shoulder impingement syndrome versus bicipital tendinitis; bilateral carpal tunnel; and depression."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on June 12, 2007, before Administrative Law Judge ("ALJ") L. Kalei Fong.   In a September 21, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. Plaintiff has the following severe impairments: degenerative disc disease and osteoarthritis;

2. Plaintiff's severe impairments do not meet or medically equal an impairment listed in the regulations;

3. Plaintiff has the residual functional capacity for light-medium work; plaintiff can lift/carry 50 pounds occasionally and 20 pounds frequently and has no sitting/standing/walking, postural, or manipulative limitations;

4. Plaintiff is capable of performing his past relevant work as a cook, chef, and kitchen planner; and

5. Alternatively, considering plaintiff's age, education, work experience, and residual functional capacity, there are a significant number of jobs in the national economy which plaintiff can perform.

After the Appeals Council declined review on December 17, 2007, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:[1]

June 4, 2002 – Jonathan Francis, M.D., reported to a claims examiner for State Compensation Insurance Fund.  (CAR 147-52).  The report outlines the following history:

> The above captioned patient is a 49-year-old cook who sustained an injury when he slipped and fell at work on [January 13, 2002].  This was at Summerville Hospital, in El Cerrito.  There was some oil and water on the floor.  The patient slipped and fell backwards onto a cement floor.  He struck his head.  He thinks he lost consciousness for about twenty seconds.  He was unable to work after the date of injury.
>
> Initially he sought treatment at Doctors Medical Center, in San Pablo.  This was on 1/13/02.  He had an x-ray of his left elbow.  He then was referred to Dr. Wallach, in El Cerrito.  He was seen there on about ten occasions.  He had physiotherapy at Physical Therapy Innovations, in El Cerrito on about fifteen occasions.  He still has not been able to return to work.

On physical examination, Dr. Francis noted that plaintiff had stiff movements getting on and off the examining table.  There was some limited mobility in plaintiff's cervical spine on forward flexion, side flexion, extension, and rotation.  The doctor observed a range of motion that was 70% of normal.  Spasm was present in the paracervical region from C2-7 extending into the trapezius bilaterally.  Encroachment test and O'Donahue maneuver were positive.  There was spasm and tenderness in the dorsal spine, but no deformity or swelling.  Dr. Francis observed limited mobility of the lumbar spine on forward flexion, side flexion, and extension at about 65% of normal.  Kemp's test and straight-leg raising were positive at 75 degrees bilaterally.  There was also a positive L3 stretch test at 15 degrees bilaterally.  Dr. Francis also observed tenderness and limited mobility of the left elbow (90% of normal).

/ / /

---

[1]     Plaintiff does not challenge the ALJ's analysis and conclusions regarding his depression.  Therefore, the court will only summarize those records relating to plaintiff's physical impairments.

1      Dr. Francis diagnosed acute sprain of the cervical and lumbar spine secondary to

2  the work injury, myofascial pain syndrome, and contusions of the posterior spinal area and left

3  elbow.  The doctor provided the following discussion of plaintiff's condition:

> At this time, the patient should remain off work.  He needs additional
> conservative treatment for these conditions.  Please authorize him to have
> some physiotherapy at our facility once weekly to consist of surface
> electrical stimulation techniques with hertz parameter setting between 2 hz
> and 200 hz, myofascial release therapy, therapeutic exercise program, and
> medication.  He should continue with this program for the next eight to ten
> weeks.

Dr. Francis also recommended that MRI studies be conducted.

      <u>August 5, 2002</u> – An MRI of plaintiff's cervical spine was performed.  (CAR 143–44).  The cervical curvature was more straightened that usually seen.  No disc herniation or stenosis was reported.  The radiologist did note, however, that multiple disc spaces showed "degenerative loss of signal."  Disc bulging was observed at C5-6 and C6-7.  The spinal cord was "intrinsically normal over the levels covered."

      On this same day, an MRI of plaintiff's thoracic spine was obtained.  (CAR 145-46).  This study showed no disc herniation or stenosis, though multiple disc spaces showed degenerative loss of signal.  There were "[m]inor 1-2 mm" disc bulges "slightly indenting" the thecal sac at disc spaces from T2 to T12.  The cord was "intrinsically normal over the levels covered."

      <u>August 7, 2002</u> – An MRI of plaintiff's lumbar spine was performed.  (CAR 141-42).  This study revealed no evidence of disc herniation, "slight-mildly reduced" left foramen and borderline stenotic right foramen at L4-5, and "moderate foraminal stenosis at L5/S1."  Disc space height and hydration were normal.

      <u>December 11, 2002</u> – According to a March 12, 2004, report prepared for State Compensation Insurance Fund by Rolf G. Scherman, M.D., Dr. Scherman also evaluated plaintiff on this date.  (<u>see</u> CAR 368).  No separate report, however, of an evaluation by Dr. Scherman in December 2002 is in the record.  In the March 2004 report, Dr. Scherman describes the

December 11, 2002, evaluation as follows:

> I have seen Mr. Shelby previously on December 11, 2002.

> The situation that emerged at that time was that the patient was a cook who also did a good deal of body building and weight lifting. At that time, the patient struck his head, left elbow, and his back on January 13, 2002, while working as a cook. He did not sustain a head injury. He had occasional slight pain in the elbow. He had a previous head injury in 1993 in which he lost his sense of smell. He continued to have back symptoms and was not able to do his gym work-outs. His examination was normal; specifically, he had no complaints about his shoulder, lower extremities or upper extremities.

February 5, 2003 – Dr. Scherman's March 12, 2004, report also references a report prepared on this date. (see CAR 368). No report from February 5, 2003, prepared by Dr. Scherman is contained in the record. This report, however, is summarized as follows in Dr. Scherman's March 2004 report:

> In my report of February 5, 2003 I received further records. All I found was some tenderness of the back muscles on the left side without neurological deficit, and thought his rating should be described as slight to moderate intermittent back pain without any specific objective findings. There was absolutely nothing to suggest he had symptoms in other parts of the body as are later alleged.

February 18, 2003 – An MRI of plaintiff's right shoulder was conducted. (CAR 139-40). The radiologist stated that clinical correlation was needed "regarding observation of marginal clearance between undersurface of acromion and superior aspect of humeral head." Also observed was a "[t]iny amount" of fluid at the supraspinatus tendon insertion site on the superior lateral aspect of the humeral head. The radiologist indicated that this raised the possibility of tendonitis.

February 25, 2003 – Dr. Francis again reported to a claims examiner for State Compensation Insurance Fund on plaintiff's course of treatment. (CAR 137-38). Dr. Francis stated:

> The above captioned patient was most recently seen in our office on 2/21/03. The patient is still experiencing ongoing cervical spine pain, as well as right, greater than left, shoulder pain.

1
2
3
4

> Recently, an MRI of the right shoulder was obtained on 2/18/03. This does show a reduced clearance between the acromion and the superior aspect of the humeral head. The possibility of mechanical impingement has been raised by the radiologist. Also, there is a slight amount of fluid, and the possibility of tendinitis is also a question. Th[ere] is also a 10 mm posterior cyst at the humeral head. Also, the biceps tendon is surrounded by fluid.

5   Dr. Francis recommended additional consultation with an orthopedic surgeon. The doctor

6   concluded: "At this time, the patient's estimation of permanent and stationary status would be

7   6/1/03."

8           March 3, 2003 – A.K. Bhattacharyya, M.D., reported on an evaluation performed

9   at the request of plaintiff's worker's compensation attorney. (CAR 445-52). Based on the

10  doctor's physical examination, he diagnosed "[e]vidence of trapezius strain, chronic cervical

11  strain, lumbosacral and right biceps sprain, and associated left lateral epicondylitis," as well as

12  "[s]ignificant right shoulder sprain with restricted motion in all directions, possible impingement

13  syndrome." The doctor attributed all these problems to the January 2002 work injury. The

14  doctor stated that plaintiff's "neck and low back complaints as well as arm complaints are

15  gradually improving" and opined that plaintiff was permanent and stationary. The doctor noted

16  that plaintiff had experienced "considerable improvement" with chiropractic care and stated that

17  plaintiff could be able to obtain relief from pain with very conservative at-home and over-the-

18  counter treatment. Dr. Bhattacharyya concluded that plaintiff is precluded from work above right

19  shoulder level, forceful pushing and pulling, heavy and repetitive hand use, and forceful hand

20  gripping and torquing.

21          May 2, 2003 – Plaintiff was examined by Anthony Bellomo, M.D., who prepared

22  an initial consultation report. (CAR 295-98). Dr. Bellomo described plaintiff's January 13,

23  2002, work injury and outlined the following complaints: "continuing pain in the neck, mid, and

24  lower back, as well as the right arm and left elbow." On physical examination, the doctor noted

25  that plaintiff had "some difficulty" moving about the examination room "due to pain," as well as

26  "some difficulty" with heel-and-toe walking. The doctor noted positive crepitus with range of

motion of the right shoulder, but negative drop-arm test, negative apprehension test, no instability, and negative impingement sign.  No problems were noted as to the elbow.  On examination of the cervical spine, Dr. Bellomo observed positive cervical tenderness and muscle spasm, positive trapezial tenderness and spasm, but negative Spurling test.  The doctor noted that plaintiff complained of pain with straight leg raising and Gaenslen sign.  Plaintiff also complained of pain in the lower back with Patrick test on the left side, but femoral stretch test was negative.  Sensation was intact over all dermatomes.  Motor strength was 5/5 in all muscle groups.  Reflexes were symmetric, and Babinski sign was absent.  Dr. Bellomo diagnosed right shoulder contusion and chronic right shoulder, neck, mid, and lower back pain.  The doctor stated that he wanted to review the MRI studies before making any recommendation as to treatment.

Incident to plaintiff's initial evaluation by Dr. Bellomo, plaintiff completed a pain assessment.  (CAR 301-18).  Plaintiff stated that he is in constant pain every day and that he is unable to do any work as a result of this pain.  He stated that he can dress himself with significant pain, can only lift light objects, and cannot walk or stand for more than 10 minutes or sit more than 30 minutes due to pain.  He also stated that he had never been treated for stress or a psychological disorder.

May 16, 2003 – Dr. Bellomo prepared a follow-up status report.  (CAR 279-80).  On physical examination, the doctor observed tenderness over the right shoulder diffusely and "mildly positive" impingement sign.  There was also positive cervical tenderness and muscle spasm, trapezial tenderness and spasm, and lumbar tenderness and spasm.  This report was submitted primarily to comment on the MRI studies.  Based on physical examination and the MRI studies, Dr. Bellomo diagnosed cervical degenerative disc disease with chronic lower back pain, right shoulder impingement syndrome, and left elbow pain.  Dr. Bellomo's treatment plan consisted of additional x-rays, physical therapy, and additional specialist consultation.

/ / /

1         May 30, 2003 – The record contains a further status report by Dr. Bellomo.  (CAR

2    272-73).  The doctor reported the same subjective history and noted that plaintiff had not yet

3    been evaluated by the physical therapist.  On physical examination, Dr. Bellomo observed

4    cervical and trapezial muscle spasm, as well as lumbar muscle spasm and tenderness.  The doctor

5    again recommended further evaluation by a specialist and that plaintiff begin physical therapy.

6         June 3, 2003 – The record contains reports by Julie Wong M.D., of x-rays of

7    plaintiff's cervical spine, thoracic spine, and lumbar spine.  (CAR 269-70).  As to the cervical

8    spine, the doctor found "multilevel degenerative disc disease with disc space narrowing, endplate

9    sclerosis, and marginal osteophyte formation."  Her impression was of mild straightening of the

10   normal cervical lordosis and multilevel degenerative changes.  As to the thoracic spine, Dr.

11   Wong noted degenerative disc changes with marginal osteophyte formation, but found no

12   evidence of an acute compression deformity.  The doctor's impression was that plaintiff had no

13   fracture, but did have degenerative changes.   As to the lumbar spine, the doctor found no

14   evidence of acute fracture, dislocation, or subluxation.  She also noted that the intervertebral disc

15   spaces were preserved, and concluded that there was no evidence of spondylolisthesis or

16   spondylolysis.

17        June 24, 2003 – The record contains a note of a phone message left by plaintiff for

18   Dr. Bellomo.  (CAR 391).  The message reads: "Guy would like you to write a letter to his

19   attorney stating that his muscle stimulator is helping him a lot. . . ."

20        July 10, 2003 – Dr. Bellomo submitted another status report.  (CAR 253-54).  By

21   this time, plaintiff had begun physical therapy.  Plaintiff reported that physical therapy and use of

22   a muscle stimulating unit were helping with pain.  On physical examination, the doctor noted

23   cervical tenderness and muscle spasm, as well as "significant pain with extension."  Dr. Bellomo

24   recommended continued physical therapy and use of the muscle stimulating device.  As to

25   / / /

26   / / /

1  plaintiff's work status, Dr. Bellomo stated:

2      The patient is able to work with the restriction of no standing or walking
3      for more than one to two hours over the entire day and no repeated
       bending or stooping, no overhead work, and no lifting more than 15
4      pounds.

5      August 19, 2003 – Dr. Bellomo prepared a follow-up status report.  (CAR 243-

6  44).  Plaintiff reported that use of the muscle stimulating machine was helping to relieve his pain.

7  He also reported an increased range of motion.  On physical examination, the doctor noted that

8  plaintiff was able to flex to approximately 45 to 50 degrees and that on prior occasions he could

9  only flex to 35 degrees.  Less muscle spasm was observed.

10      September 26, 2003 – The record contains a further progress report from Dr.

11  Bellomo.  (CAR 234-35).  Plaintiff again reported that physical therapy and use of the muscle

12  stimulating machine were helping relieve his pain symptoms.  As to work status, Dr. Bellomo

13  stated:

14      The patient is able to return to work with the restriction of no standing or
       walking for more than two hours over the entire day, including bending
15      and stooping, no overhead work, and no lifting more than 15 pounds.

16      October 17, 2003 – Dr. Bellomo prepared another progress report.  (CAR 225-26).

17  Plaintiff reported to the doctor that he had "tried to shampoo his carpet last week, and this flared

18  up his pain for a period of time."  Despite having indicated in prior progress reports that physical

19  therapy was helping with his pain symptoms, as well as a contemporaneous report (discussed

20  below) on the progress of plaintiff's physical therapy, Dr. Bellomo stated: "The patient, as of yet,

21  has not been to physical therapy. . . ."  On physical examination, the doctor noted muscle spasm

22  in the cervical as well as upper and lower lumbar regions.  Dr. Bellomo indicated that plaintiff

23  "ought to be started on a course of physical therapy in order to decrease the spasming in his

24  back."  The doctor provided the same work status assessment as in prior reports.

25  / / /

26  / / /

9

On this same day , physical therapist Carolyn Silan provided a progress report. (CAR 158).  She outlined the following history:

> Mr. Shelby has been seen for a re-evaluation today after not having been in therapy since August 13, 2003.  He had inconsistent attendance between June 6, 2003, when he was initially evaluated, and August 13, 2003, only having 13 visits over that time.

Ms. Silan reported that, objectively, plaintiff demonstrated "severe limitations in thoracic spine extension. . . ."

November 7, 2003 – The record contains a further progress report from Dr. Bellomo.  (CAR 216-17).  Plaintiff's complaints and the doctor's observations on physical examination were largely unchanged from previous reports.  As to work status, the doctor stated that plaintiff could return to work with a restriction to no standing or walking for more than two hours over the entire day, and no repeated bending or stooping.  Dr. Bellomo did not note any restrictions with respect to lifting or overhead reaching.

December 3, 2003  – Ms. Silan submitted another report on the progress of plaintiff's physical therapy.  (CAR 155).  She stated that plaintiff demonstrated "improved thoracic spine extension. . ." though she noted continued restriction in the upper/mid thoracic spine that is worse on the left and especially prominent at T4.  She noted that plaintiff found benefit from stretching over the therapy ball.

January 6, 2004 – Dr. Bellomo submitted a further progress report.  (CAR 207-08).  At this time, plaintiff reported that his pain is "approximately 8 on a scale of 1 to 10" 25% of the time.[2]  The doctor's observations on physical examination were unchanged from previous reports.  He did note that "patient has indicated that he has stopped physical therapy

/ / /

/ / /

---

[2]      This differs from prior reports by plaintiff to Dr. Bellomo in which plaintiff stated his pain was constant.

10

1    approximately three weeks ago and has been there for approximately one month."[3]  Dr.

2    Bellomo's work status assessment was the same as that offered on November 7, 2003.

3    Specifically, the doctor did not opine any limitations with respect to lifting or overhead reaching.

4            March 12, 2004 – Dr. Scherman reported on a medical examination performed on

5    March 1, 2004.  (CAR 368-72).  The doctor noted the following subjective complaints:

6            Since last seeing the patient, there really has not been any change in his
             condition.  He continues to have tightness in the neck, upper back, and the
7            right shoulder with some tingling in the hands which is not descriptive and
             does not go into any particular distribution.  He is not working at the
8            present time.

9            Mr. Shelby is not taking much in the way of medication.  Physical therapy
             reportedly has not helped.
10

11           Mr. Shelby indicates he has constant back pain which is not very
             pronounced and is made worse with prolonged sitting and standing.  It is
             also made worse with lifting and bending.  He does not know how much
12           lifting and bending he is capable of doing at the present time.  There is no
             pain going into the lower extremities.  He does have some aching in the
13           right hip.

14           Basically, there has been no change from what has been noted before.
             None of the treatment has helped him.
15

16   On neurologic examination, Dr. Scherman observed "full and free" range of shoulder

17   movements.  He also noted no weakness or atrophy of the upper extremities.  Reflexes were

18   equal.  Tinel's sign and Phalen's test were negative.  Plaintiff back was slightly tender and

19   plaintiff was able to bend over and almost touch his toes.  Lateral flexion and extension were

20   "well done."  Hip movements caused no pain.  Dr. Scherman provided the following summary

21   and impressions:

22           Let me again reiterate the initial treating physicians, Dr. Francis as well as
             myself, did not find any history of neck pain, shoulder pain, tingling in the
23           hands, or hip pain.  All of this is a later addition, for reasons that remain a
             mystery to me, by Dr. Bellomo and [Dr.] Bhattacharyya who believe this
24           to be related to his original slip and fall.  This obviously makes no sense at

25   _____
        [3]      This is somewhat inconsistent with the reports from Ms. Silan concerning
26   plaintiff's physical therapy treatment.

all because these symptoms are a much later addition and developed at
least six months after the injury.  A slip and fall causes immediate injury,
but not delayed problems of this type.

* * *

Objectively, I can find very little with his low back.  His condition remains
subjective.  I continue to believe that his overall condition should be
described as intermittent slight to moderate pain in the low back.  This
could be described as a disability precluding very heavy work.

* * *

I think he has remained permanent and stationary since December 11,
2002, and has not changed.

* * *

I do not believe any further treatment can be prescribed. . . . [¶] Frankly, I
think he is able to do his usual and customary job on the basis of this
examination.

March 26, 2004 – Dr. Bellomo prepared a follow-up progress report.  (CAR 198-

99).  On physical examination, the doctor observed that plaintiff "has some difficulty moving

about the examination table due to pain."  He also noted decreased range of motion of the

cervical spine secondary to pain, as well as tenderness and muscle spasm.  Dr. Bellomo

diagnosed cervical and lumbar degenerative disc disease.  The doctor's treatment plan was to

obtain additional MRI data and for plaintiff to continue use of a muscle stimulating machine and

attend physical therapy.

April 16, 2004 – Dr. Bellomo prepared a "Supplemental Report" for the claims

representative at State Compensation Insurance Fund.  (CAR 195-96).  In this report, the doctor

commented on his review of video tapes of plaintiff, presumably provided by the insurance

company.  Specifically, Dr. Bellomo commented on video taken of plaintiff on October 9, 2002,

December 11, 2002, July 7, 2003, and July 8, 2003 – all dates after his work accident in January

2002.  As to October 9, 2002, the doctor stated:

The patient is seen walking on a surface street.  He does not appear to be
in any significant distress at the time.  He is also seen driving his
automobile.  At 4:07 p.m. . . . the patient is observed ambulating in a

1
2
3

    parking lot without any significant distress.  He is observed standing in a
    parking lot, waiting for an order at a taco stand.  The patient is observed
    standing for approximately four to five minutes.  The patient then returned
    to his car and remains seated.

4   As to December 11, 2002, the doctor reported that "the patient is seen ambulating in a parking

5   lot, entering a hospital" and that plaintiff did these things "without any difficulty."  As to July 7,

6   2003, Dr. Bellomo stated that "the patient is seen walking in a parking lot without significant

7   difficulty," "the patient is seen entering his car, ambulating without any difficulty," and "[t]he

8   patient appears to be bending at the waist."  As to this date, the doctor added:

9
10
11

    . . . [T]he patient is seen ambulating with some difficulty using a cane in
    his right hand.  It also shows that he is experiencing some pain on his right
    side at that point.  The patient is shown having difficulty getting into his
    car at that same time.

12  Finally, as to July 8, 2003, the doctor stated:

13
14

    . . . [T]he patient is seen ambulating in a parking lot.  It is noted that the
    patient is ambulating with slower cadence than normal. . . .

15  Dr. Bellomo offered the following comments regarding these videos:

16
17
18
19

    After reviewing the two video tapes, I can see nothing inconsistent with
    the patient's presentation that I have seen in my office.  It is noted on
    occasion that the patient had bent at the waist, as is done periodically, even
    with patients that have significant back pain.  It is also noted on July 7th,
    the patient is seen ambulating in the parking lot without a cane and having
    significant difficulties, indicating on the screen that he is having pain
    primarily on his right side.  It is apparent that during the course of that day,
    the patient due to his activities, had a flare-up of pain.

20
21
22
23
24

    It is also noted that the first videotape viewed was in October and
    December 2002.  The second videotape was July of 2003. In the second
    videotape, the patient's movements appeared somewhat painful.  In
    particular, the patient was experiencing difficulty getting in and out of his
    car, and the patient's symptomatology may have progressed in the interim.
    This would not be inconsistent with a degenerative process, from the
    lumbar spine. . . .

25  / / /

26  / / /

13

1         <u>April 20, 2004</u> – Harvey L. Eichler, M.D., a medical consultant for State

2    Compensation Insurance Fund, issued reports regarding Dr. Bellomo's repeated requests that

3    plaintiff be referred to a specialist regarding shoulder pain, that plaintiff attend continuing

4    physical therapy, and that additional MRI studies be obtained.  (CAR 354-55).  Dr. Eichler

5    recommended denying any further treatment.  As to the referral, the doctor stated:

6            The request for referral to Dr. Chan is denied due to lack of medical
        necessity as there is no reason stated for the referral.  The reports from Dr.

7            Bellomo and Dr. Scherman do not document any injury to the shoulder on
        1/13/02 or any connection between current shoulder complaints and the

8            industrial injury.

9    Dr. Eichler noted that Dr. Scherman had opined that plaintiff was permanent and stationary since

10   December 11, 2002, and had subjective back pain with no abnormal findings.  According to Dr.

11   Eichler, Dr. Scherman did not recommend any further consultation or treatment.  Dr. Eichler

12   cited the same reasons for recommending denial of further physical therapy or MRI studies.

13        <u>April 28, 2004</u> – De Bellomo prepared a progress report in which he indicated that

14   plaintiff has been unresponsive to conservative measures.  (CAR 187-88).  As to work status, the

15   doctor stated that plaintiff could return to work with only a restriction to no standing or walking

16   for more than two hours, and no repeated bending or stooping.  No restrictions as to lifting or

17   overhead reaching are noted.

18        <u>May 13, 2004</u> – Dr. Bellomo submitted a progress report.  (CAR 169-70).  Dr.

19   Bellomo reported that plaintiff returned "earlier than normal" due to increasing lower back pain.

20   The doctor also noted his understanding that physical therapy and MRI exams had been denied

21   by the insurance carrier.  On physical examination, Dr. Bellomo observed mild cervical

22   tenderness and paraspinous muscle spasm, trapezial tenderness and spasm, decreased range of

23   motion of the lumbar spine secondary to pain, and tenderness over the right and left lower lumbar

24   facet joints with associated spasm.  The doctor recommended facet injections at L4-5 and L5-S1

25   as a diagnostic procedure.

26   / / /

1          May 20, 2004 – The record contains a "Consultant Assessment" prepared by

2  Richard Martin, M.D., incident to plaintiff's request for a facet injection.  (CAR 340).  The

3  doctor recommended delaying authorization and provided the following rationale:

> One could very reasonably question the medical indications for this.  The
> def[ense] QME provided what appears to be a reasonable questioning of
> the need for ongoing aggressive therapy.  Reviews of the reports of pain
> note it is quite intermittent and has become pan spinal over time.  With
> widespread pain complaints there is almost no chance a procedural
> approach will help.  More and more literature is supportive of this type of
> presentation as being abnormal pain processing and not a specific
> anatomical problem that is helped with procedures.

9          June 16, 2004 – Dr. Bellomo prepared another progress report.  (CAR 163-64).

10  Dr. Bellomo recited the following history:

> The patient returns today continuing to have pain in the neck, mid, and
> lower back, with pain involving the right shoulder and right groin.  The
> patient indicates that his pain level is 8 on a scale of 10.  After review of
> the current pain assessment, the patient indicates that his pain is made
> worse primarily with such activities as bending, lifting, prolonged
> standing, prolonged sitting, getting out of cars and chairs, and walking.

15  On physical examination, the doctor observed that plaintiff sat comfortably and did not appear to

16  be in acute distress.  The doctor also observed mild cervical tenderness with associated spasms,

17  positive lumbar tenderness and spasm, and decreased lumbar and cervical range of motion

18  secondary to pain.  Dr. Bellomo diagnosed lumbar degenerative disc disease with mid-back pain.

19  The doctor recommended further consultations with other specialists as well as facet joint

20  injections bilaterally at L4-5 and L5-S1.

21          In the pain assessment referenced by Dr. Bellomo in his report, plaintiff indicated

22  that he has pain every day, but that it is not constant.  (CAR 166-68).  He said that, when he does

23  have pain, it is disabling.  Plaintiff reported an inability to work.  Plaintiff stated that he could

24  walk for 1/4 mile without stopping.

25  / / /

26  / / /

1          July 13, 2004 – Dr. Bellomo appealed a decision to delay authorization for

2   plaintiff to undergo a bilateral L4-S1 medial branch block procedure.  (CAR 162).  The doctor

3   stated the following reasons:

4               In Mr. Shelby's most recent appointment with Dr. Bellomo, it was
            noted that the patient needed this procedure.  The delay letter stated that
5           this procedure was a temporary form of pain relief and that it will not help.
            However, our doctors seem to disagree.  They did not recommend that the
6           injections will cure his problem, they stated that it will help find the region
            of the problem and result in temporary pain relief.  Any pain relief would
7           be helpful for a person with consistent back pain.  The doctor also
            recommended that he see one of the surgeons in our practice to go further.
8           The doctor would like you to re-evaluate in hope of some pain [relief]
            before further treatment for Mr. Shelby.  Please refer to the treatment plan
9           in the attached doctor's note.

10          January 29, 2005 – Agency examining doctor Steve McIntire, M.D., reported on a

11  comprehensive orthopedic evaluation.  (CAR 401-05).  Based on his examination, Dr. McIntire

12  provided the following functional assessment:

13          Subjectively, the claimant describes a history of a lumbar injury as well as
            right shoulder and knee pain.
14
            Objectively, there is minimal loss of range of motion of the lumbar spine.
15          There is no bony deformity or paraspinal muscle spasms.  There are no
            findings to suggest a radiculopathy or myelopathy.  On examination of the
16          knees, the claimant has slight joint line tenderness and crepitus, but no
            ligamentous instability or loss of range of motion or bony deformity.  The
17          claimant has a normal gait.  On examination of the shoulder, there is no
            loss of range of motion.  Impingement and apprehension signs are absent.
18          There is slight tenderness on palpation.

19          Given the above findings, the claimant would have functional limitations
            in terms of very heavy lifting or carrying activities, such as lifting or
20          carrying more than 25 pounds frequently or 50 pounds occasionally.  The
            present exam itself does not point to additional specific functional
21          limitations.  There are not limitations suggested in terms of time sitting,
            standing, or walking.  There are not postural or manipulative limitations
22          suggested by the present exam.

23          April 26, 2005 – An agency consultative physician submitted a physical residual

24  functional capacity assessment.  (CAR 406-13).  The doctor opined that plaintiff could lift/carry

25  50 pounds occasionally and 25 pounds frequently; sit/stand/walk for 6 hours in a workday; and

26  push/pull without limitation.  No other limitations were noted.

1          August 9, 2006 – Patricia D. Will, M.D., reported on an "SSI examination"

2   performed on August 4, 2006.  (CAR 430-32).  Plaintiff reported to the doctor that he could not

3   sit for longer than one hour, and could not stand longer than 30 minutes.  He stated that he could

4   walk for up to 1/2 mile before having to sit down.  Plaintiff was not taking any medications at the

5   time.  As to daily activities, plaintiff reported that he buys and cooks his own food, does his own

6   laundry, does some chores, swims in the pool, and watches television.  Dr. Will's report indicates

7   that forms related to plaintiff's work capacity were completed, but such forms are not in the

8   record and the parties do not offer the court any summary of the doctor's functional assessment.

9

10                          **III.  STANDARD OF REVIEW**

11          The court reviews the Commissioner's final decision to determine whether it is:

12   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

13   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

14   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

15   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

16   support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

17   including both the evidence that supports and detracts from the Commissioner's conclusion, must

18   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

19   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

20   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

21   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

22   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

23   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

24   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

25   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

26   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

1  standard was applied in weighing the evidence, <u>see</u> <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th

2  Cir. 1988).

3

4  ## IV.  DISCUSSION

5  In his motion for summary judgment, plaintiff argues: (1) the ALJ failed to

6  properly credit the opinions of plaintiff's treating physician, Dr. Bellomo; (2) the ALJ erred in

7  concluding that plaintiff was not credible; and (3) as a result of the ALJ's flawed residual

8  functional capacity assessment, the ALJ relied on the vocational expert's answer to a

9  hypothetical question which did not accurately describe plaintiff's capability, causing the ALJ to

10  err in concluding that plaintiff could perform his past relevant work or, alternatively, that other

11  jobs existed in significant numbers which plaintiff could perform.  The court notes that plaintiff's

12  arguments are confined to the ALJ's analysis of his physical impairments.  In particular, while

13  plaintiff mentions depression as a severe impairment, plaintiff does not challenge the ALJ's

14  conclusions regarding his depression.

15  ### A.    <u>Dr. Bellomo's Opinions</u>

16  The weight given to medical opinions depends in part on whether they are

17  proffered by treating, examining, or non-examining professionals.  <u>See</u> <u>Lester v. Chater</u>, 81 F.3d

18  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

19  professional, who has a greater opportunity to know and observe the patient as an individual,

20  than the opinion of a non-treating professional.  <u>See</u> <u>id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285

21  (9th Cir. 1996); <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

22  to the opinion of a non-examining professional.  <u>See</u> <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 & n.4

23  (9th Cir. 1990).

24  ///

25  ///

26  ///

18

1          In addition to considering its source, to evaluate whether the Commissioner

2    properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

3    in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

4    uncontradicted opinion of a treating or examining medical professional only for "clear and

5    convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

6    While a treating professional's opinion generally is accorded superior weight, if it is contradicted

7    by an examining professional's opinion which is supported by different independent clinical

8    findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

9    1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

10   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

11   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

12   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

13   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

14   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

15   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

16   without other evidence, is insufficient to reject the opinion of a treating or examining

17   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

18   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

19   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

20   see also Magallanes, 881 F.2d at 751.

21          Plaintiff argues that the ALJ improperly rejected Dr. Bellomo's opinion that he

22   was precluded from sitting/standing/walking more than two hours, overhead work, lifting more

23   than 15 pounds, and bending/stooping.  He asserts that the ALJ erred in rejecting this treating

24   source opinion (which plaintiff states was consistent with the opinions of Drs.  Francis,

25   Bhattacharyya, and Wills) in favor of the opinions of agency examining physician Dr. McIntire,

26   the agency non-examining source, and Dr. Scherman.

As to Dr. Bellomo, the ALJ stated:

> Treating physician, Anthony Bellomo, M.D., opined in July 2003 that the claimant's injury to his spine and right shoulder caused him to be unable to stand for long periods of time, do overhead work, lifting and repeated bending and stooping (Ex. 14F). Through the continuation of conservative care, Dr. Bellomo noted improvement to such a point that in November 2003 he opined that the claimant was able to return to work with a restriction of no standing/walking for more than two hours over the entire day or repeated bending or stooping (Ex. 3F). The undersigned assigns minimal weight to the opinion of Dr. Bellomo, even through he is a treating physician, as his conclusions are not supported by detailed clinical diagnostic evidence that would be likely to cause such an extreme reduction of functionality.

Rather than accepting Dr. Bellomo's opinion, the ALJ accepted those expressed by the agency doctors and Dr. Scherman. As to agency examining physician, Dr. McIntire, the ALJ summarized the doctor's objective findings and functional capacity assessment and stated: "The undersigned finds the opinion of Dr. McIntire persuasive, consistent with the record, and well-supported by objective findings and, therefore, accords it significant weight." As to the agency consultative doctor's assessment, the ALJ stated: "The State Agency consultant's opinion, as they pertain to the claimant's impairments, show consistency with the record and are thus found persuasive by the undersigned." Finally, as to Dr. Scherman, the ALJ stated: "Noting the extensive objective findings that form the basis of Dr. Scherman's opinion, as well as the established consistency with the record, the undersigned assigns significant weight to his assessment."

Given that Dr. Bellomo's opinion is clearly contradicted by those of the agency doctors as well as Dr. Scherman, the ALJ need only provide a specific and legitimate reason for rejecting the treating physician's opinion. In this case, the ALJ rejected Dr. Bellomo's opinion because it is not supported by detailed clinical findings which are consistent with an extreme reduction in functional capacity. The court finds that this reason satisfies the appropriate legal standard.

/ / /

1    The question, then, is whether the ALJ's conclusion – that Dr. Bellomo's

2    objective findings are inconsistent with the extreme limitations the doctor opined – is supported

3    by substantial evidence.  The court finds that it is.  A review of Dr. Bellomo's various progress

4    reports reveals little in the way of objective findings which would suggest the limitations he

5    suggested.  Upon initial examination on May 2, 2003, Dr. Bellomo noted negative drop-arm test,

6    negative apprehension test, negative impingement sign, negative Spurling test, negative femoral

7    stretch test, intact sensation, intact motor strength in all muscle groups, no instability, and

8    absence of Babinski sign.  The doctor noted only "some difficulty" moving about the

9    examination room, "some difficulty" with heel-and-toe walking, tenderness, and muscle spasm.

10   Such limited positive findings are inconsistent with the opinion expressed by Dr. Bellomo.

11   Dr. Bellomo continued to note only minor positive findings on subsequent

12   evaluations.  On May 16, 2003, the doctor noted only "mildly positive" impingement sign in the

13   right shoulder, as well as some tenderness and muscle spasm in the back.  Similar observations

14   were recorded on May 30, 2003, and July 10, 2003.  By August 19, 2003, Dr. Bellomo noted that

15   plaintiff's ability to flex had increased from 35 degrees to 40-50 degrees and that plaintiff had

16   less muscle spasm.  By November 7, 2003, Dr. Bellomo's report indicates even further

17   improvement in that the doctor no longer expressed any restrictions in lifting and overhead

18   reaching.  In fact, these restrictions do not appear in any of Dr. Bellomo's subsequent progress

19   reports.  As with Dr. Bellomo's earliest observations, in his March 26, 2004, progress report the

20   doctor noted only "some difficulty moving about the examination table" and unspecified

21   tenderness and spasm.  By June 16, 2004 – the last progress report the doctor prepared – Dr.

22   Bellomo noted that plaintiff was able to sit comfortably and did not appear to be in acute distress.

23   He also observed only mild cervical tenderness and spasm.

24   / / /

25   / / /

26   / / /

1        Thus, not only do Dr. Bellomo's reports reveal a lack of detailed findings

2   consistent with extreme limitations, they actually indicate improvement with conservative

3   treatment.  As discussed above, the doctor observed on physical examination that, over time,

4   plaintiff's ability to flex had increased and he eventually dropped any restrictions related to

5   lifting or overhead reaching.  This pattern of improvement is consistent with other evidence in

6   the record.  In March 2003, Dr. Bhattacharyya reported that plaintiff's "neck and low back

7   complaints as well as arm complaints are gradually improving" and opined that plaintiff was

8   permanent and stationary.  The doctor also noted that plaintiff had experienced "considerable

9   improvement" with chiropractic care and believed that no more than conservative care was

10  warranted.  On June 24, 2003, plaintiff left a phone message with Dr. Bellomo indicating that use

11  of a muscle stimulating machine was "helping . . . a lot. . . ."  By July 2003 plaintiff was

12  attending physical therapy and reported that it was helping with his pain.  Plaintiff reported the

13  same progress when he saw Dr. Bellomo in September 2003.  By October 2003 plaintiff was

14  feeling well enough to try and shampoo his carpet and, though this caused a flare-up, Dr.

15  Bellomo continued to believe that physical therapy and other conservative treatment would

16  provide relief.  In December 2003, plaintiff's physical therapist reported that plaintiff

17  demonstrated improved spine extension.  In January and June 2004 plaintiff reported that he was

18  experiencing severe pain only 25% of the time, whereas in May 2003 he reported constant pain.

19        What strikes the court as remarkable about Dr. Bellomo's functional assessment is

20  how at odds it is with the doctor's own recommendations regarding plaintiff's course of

21  treatment.  Specifically, Dr. Bellomo consistently recommended conservative treatment – such as

22  use of a muscle stimulating machine, physical therapy, and limited medication – for pain relief.

23  Dr. Bellomo never recommended surgery.  While Dr. Bellomo did eventually recommend facet

24  injections, the court must agree with the conclusion reached by the doctor for State

25  Compensation Insurance Fund that such aggressive treatment was not warranted by Dr.

26  Bellomo's own objective findings.

On this record, the court simply cannot conclude that the ALJ's reason for rejecting Dr. Bellomo's opinion as to plaintiff's functional limitations is unsupported by substantial evidence.  Plaintiff's argument to the contrary is unpersuasive.

### B.   Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

> 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

/ / /

1    The Commissioner may, however, consider the nature of the symptoms alleged,

2  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

3  947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

4  claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

5  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

6  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

7  (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

8  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

9  claimant cooperated during physical examinations or provided conflicting statements concerning

10  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

11  claimant testifies as to symptoms greater than would normally be produced by a given

12  impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

13  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

14    As to plaintiff's credibility, the ALJ stated:

15    The claimant testified that he stopped working in January 2002 as he
      slipped and fell.  He noted that the incident was settled as a workers'
16    compensation case in 2004 for a lump-sum of $18,000 and that he gave up
      rights for continued medical coverage.  He noted that he was still seeing
17    Dr. Bellomo in April 2004 for neck, back, and shoulder pain and was told
      that he could go back to work with restrictions of walking for two hours.
18    He reported that he takes over-the-counter Motrin for headaches and is
      able to lift/carry 20 pounds, but cannot lift overhead because of a shoulder
19    problem.  He stated that he has not had surgery on his shoulder or back,
      just physical therapy.  He reported that he can sit for 1 1/2 hours and then
20    must move around; uses a TENS unit; can stand for a 1/2 hour; and can
      walk two blocks.  He reported that he has constant stabbing pain in his
21    back and pain in his shoulder.

22    After considering the evidence of record, the undersigned finds that the
      claimant's medically determinable impairments could reasonably be
23    expected to product the alleged symptoms, but that the claimant's
      statements concerning the intensity, persistence, and limiting effects of
24    these symptoms are not credible.  The claimant alleges disabling back,
      shoulder, and knee pain associated with a fall while at work in 2002.  The
25    evidence supports that the claimant recovered well through a rather short
      course of physical therapy and follow-up treatment.  It appears that the
26    claimant has not had ongoing treatment since the settlement of his

24

workers' compensation claim in mid-2004.  Practitioners determined a permanent and stationary status at that time and were at a loss to specify an etiology for continued pain complaints in light of the dearth of objective findings.  Dr. Scherman contended that the use of a TENS stimulator was not recommended as it would be an excessive form of treatment.  Despite current pain complaints, the record shows only some decreased range of motion in the back.  There is normal range of motion in all other joints as well as normal muscle strength, reflexes, and sensation.  The claimant reported that he is independent as to his bathing and grooming; goes for walks; takes turns cooking; shares the chores; and takes public transportation as his license has expired.  The undersigned notes that the claimant appeared healthy at the hearing and did not have to stand during the proceedings.

Plaintiff first argues that the ALJ's statement that plaintiff "recovered well" after his January 2002 injury "through a rather short course" of conservative treatment is not supported by the record.  Second, plaintiff appears to contend that Dr. Bellomo's objective findings and diagnoses constitute specific reasons for plaintiff's pain symptoms and, therefore, he satisfies the Cotton test.  Third, plaintiff asserts that the ALJ's conclusion that plaintiff's daily activities are inconsistent with his testimony regarding the severity and limiting effects of pain is not supported by an accurate reading of the record.

1.    Plaintiff's Course of Treatment

In determining that plaintiff's statements as to the intensity and limiting effects of his pain were not credible, the ALJ cited plaintiff's conservative course of treatment, noting that plaintiff "recovered well."  Plaintiff argues that, in fact, he did not recover.  This contention, however, is belied by the record in general and Dr. Bellomo's treatment notes in particular.  Specifically, as discussed in greater detail above, plaintiff's course of treatment with Dr. Bellomo was remarkably conservative, consisting of physical therapy, limited prescription and over-the-counter pain medications, and use of a muscle stimulation unit.  No doctor ever recommended surgery and facet injections were deemed unnecessary given the lack of specific objective findings indicating a need for more aggressive treatment.

/ / /

/ / /

1    Further, Dr. Bellomo's treatment notes do in fact indicate that plaintiff's condition

2    improved over this course of conservative treatment.  For example, early on in his treatment of

3    plaintiff, Dr. Bellomo opined that plaintiff could not perform any work tasks involving overhead

4    reaching or lifting more than 15 pounds.  These restrictions were dropped from the doctor's latter

5    work function assessments, indicating that at least some impairments had either been resolved or

6    no longer limited plaintiff's ability to perform work activities.  Similarly, plaintiff initially

7    reported to Dr. Bellomo constant level 8 pain but, by the end of his treatment plaintiff reported

8    such pain occurring only 25% of the time.  This again indicates significant improvement.

9    While the record does not establish that plaintiff "recovered" in the sense that all

10   of his injuries had been resolved to the point that plaintiff had no pain, the court cannot fault the

11   ALJ's decision to the extent she concluded that the evidence demonstrates a conservative course

12   of treatment leading to significant improvement.  The ALJ was certainly entitled to conclude that

13   plaintiff's testimony of totally disabling pain is out of proportion to the objective evidence and,

14   for this reason, not credible.

15   Plaintiff discusses in his brief his inability to afford further treatment following

16   settlement of his worker's compensation case in 2004.[4]  Plaintiff cites Regenniter v.

17   Commissioner of Social Security, 166 F.3d 1294 (9th Cir. 1999), for the proposition that the lack

18   of money to afford treatment is not a valid reason to reject a claimant's credibility.  This

19   argument strikes the court as somewhat out of place given that the ALJ in this case never cited

20   plaintiff's inability to afford medication or treatment as a reason to discount his pain testimony.

21   In any event, plaintiff's conservative course of treatment does not appear to have

22   been the result of a lack of funds, but the nature of plaintiff's injuries.  The record shows that,

23   notwithstanding plaintiff's statement that he could no longer afford treatment after his case

24   settled in 2004 (resulting in a large lump-sum cash payment), he did not require further

25

26   [4]    Given that plaintiff received a substantial lump-sum cash settlement, the court
     finds it difficult to see a factual basis for this statement.

26

1   treatment.  In January 2005, Dr. McIntire reported essentially normal objective findings and

2   concluded that plaintiff did not have any significant work-related limitations.  The agency

3   consultative doctor agreed in April 2005.  In August 2006 plaintiff reported to Dr. Will an

4   inability to sit for more than one hour or stand for more than 30 minutes.  However, by this time,

5   plaintiff was not taking any medications for pain, he could walk up to 1/2 mile, he could do his

6   own cooking, grocery shopping and laundry, he could to some household chores, and he could

7   swim in a pool.

8          For all these reasons, the court does not find that the ALJ erred in referencing

9   plaintiff's conservative course of treatment and apparent medical improvement as a reason to

10  discredit his testimony as to the severity and limiting effects of pain.

11               2.    Causal Relationship Between Findings and Diagnoses and Pain

12         In an apparent reference to the Cotton test, plaintiff argues that "there were

13  specific reasons for Mr. Shelby's pain."  He points to Dr. Bellomo's findings and diagnoses, as

14  well as those of Drs. Bhattacharyya and Francis, in challenging the ALJ's adverse credibility

15  finding regarding plaintiff's testimony of totally disabling pain.  Under the Cotton test, a causal

16  connection between medically determinable impairments and pain is required.  Thus, if a

17  claimant has an impairment which would tend to cause the type of pain to which the claimant

18  testifies, the claimant need not produce objective evidence establishing the severity of pain.  This

19  test recognizes that the severity and intensity of pain is subjective and not amenable to objective

20  verification.  However, the ALJ may consider whether the claimant's testimony as to severity and

21  limiting effects of pain is out of proportion to the medically determinable impairment.

22         As discussed above, the record supports the ALJ's conclusion that plaintiff's

23  testimony of totally disabling pain is out of proportion to the objective findings and plaintiff's

24  conservative course of treatment.  As to Dr. Bhattacharyya, while this doctor reported in March

25  2003 objective evidence of trapezius strain, chronic cervical strain, lumbosacral and right biceps

26  sprain, and associated left lateral epicondylitis, as well as "[s]ignificant right shoulder sprain with

27

1  restricted motion in all directions, possible impingement syndrome," he nonetheless noted that

2  plaintiff's injuries were "gradually improving."   The doctor also noted "considerable

3  improvement" with the current course of conservative treatment.   The court concludes that Dr.

4  Bhattacharyya's report lends further support to the ALJ's credibility determination.  Similarly,

5  when Dr. Francis reported on plaintiff's condition in June 2002 – only a few months after

6  plaintiff's work injury – the doctor recommended only conservative treatment.  Again, this

7  supports the ALJ's credibility finding.

8         The court finds that the ALJ made no error with respect to the requirements of the

9  Cotton test.  In fact, consistent with the Cotton test, the ALJ specifically found that plaintiff's

10  "medically determinable impairments could reasonably be expected to product the alleged

11  symptoms."  For the reasons discussed above, the ALJ was correct in concluding that,

12  notwithstanding the established causal connection, plaintiff's testimony as to the severity and

13  limiting effects of pain was not credible.

14              3.      Plaintiff's Daily Activities

15         Finally, plaintiff argues that the ALJ erred with respect to her analysis of

16  plaintiff's daily activities.  Plaintiff states that, while he was able to do activities such as

17  grooming, chores, and cooking, doing so resulted in extreme pain.  Plaintiff argues that his

18  "minimal activities hardly evidenced an ability to engage in full-time work on a sustained basis."

19  Plaintiff cites Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998), for the proposition that a

20  claimant should not be penalized for attempting to live a normal life and should not be required

21  to "vegetate in a dark room" in order to receive benefits.

22         While plaintiff is certainly correct with respect to his citation to the court's

23  observations in Reddick, the court also observed in that case that the ALJ may consider in her

24  credibility assessment whether "the level of activity [is] inconsistent with Claimant's claimed

25  limitations. . . ."  Id. (emphasis added).  Here, the ALJ did just that by considering the extent of

26  plaintiff's daily activities and comparing this to plaintiff's testimony of totally debilitating pain.

28

1   For example, the ALJ accurately noted plaintiff's statements to Dr. Will in August 2006 that he

2   cooks, does grocery shopping, does laundry, does some chores, and swims in a pool.

3          **C.     Hypothetical Questions**

4                  Hypothetical questions posed to a vocational expert must set out all the

5   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

6   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

7   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

8   has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

9   the ALJ may pose to the expert a range of hypothetical questions based on alternate

10  interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

11  determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

12  Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

13                 A review of the hearing transcript reflects that the following exchange took place

14  between the ALJ and vocational expert:

15                 Q:     Okay, let me provide you some hypotheticals.  And we are
        dealing with someone of the same age, education, and past work
16      experience as the Claimant.  All right.  Hypothetical one, can lift and carry
        20 pounds frequently, 50 pounds occasionally.  There are no limitations
17      with the sit, stand, or walk, and there are no postural or manipulative
        limitations.  So based on that hypothetical, and this is from 6F, can he do
18      his past relevant work?

19                 A:     With that hypothetical, that individual would qualify for
        medium work.  There's no limitations there so, yes, that individual could
20      perform past relevant work.

21                 Q:     Okay, hypo two, person, again, is able to lift and carry 50
        pounds occasionally, 20 pounds frequently, can, can stand 30 minutes
22      maximum at a time, not to exceed two hours, can walk up to 15 minutes at
        a time, not to exceed two hours, can sit 1.5 hours at a time, not to exceed
23      six hours.  Cannot do repetitive bending or stooping.  Can this person
        perform any of his past relevant work?
24
25                 A:     No.  In spite of the lifting abilities, they're confined to
        pretty much sedentary work with a sit stand option, and those jobs would
26      not permit that.

1   The vocational expert then testified that, while a person described in the ALJ's second

2   hypothetical could not perform plaintiff's past relevant work, such a person could perform work

3   as a surveillance monitor, table worker, and assembler, and that such jobs exist in significant

4   numbers in the national economy.  The ALJ then proceeded to ask a third hypothetical question:

> Q:      Okay.  Okay, let me give you a hypo three.  Able to lift and carry 20 pounds occasionally, 10 pounds frequently.  Can sit 1.5 hours, not to exceed six hours total, so 1.5 hours max at a time, can walk 14 minutes, not to exceed two hours.  Precluded from using anything over shoulder level, in other words, would be precluded from lifting overhead of, of both hands.  Should also have mild limitation with pushing and pulling, forceful pushing and pulling and repetitive use of hands.
>
> * * *
>
> A:      No past relevant work can be performed.  The, first of all the surveillance monitor job would be, would, would fall within those ratings.
>
> * * *
>
> A:      The other two jobs [table worker and assembler] would have to be eliminated due to repetitive use of the hands that is required in those two jobs.

15  The vocational expert did not identify any other jobs which satisfied the third hypothetical.

16  Finally, in response to a question by plaintiff's attorney, the vocational expert testified that an

17  individual who had to leave the work station every hour and a half to walk and stretch would not

18  be able to perform any of the identified jobs.

19          Plaintiff argues: "Had the ALJ properly credited Dr. Bellomo's opinions, Mr.

20  Shelby's testimony, and the testimony of the VE, Mr. Shelby would have been found disabled

21  since there were no jobs he would be able to perform if required to be away from the work

22  station every hour and a half."  Plaintiff also argues that, if plaintiff is accurately described by

23  hypotheticals two or three, Medical-Vocational Rule 201.14 would have directed a finding of

24  disabled.  These arguments are unpersuasive because, for all the reasons discussed above, the

25  court finds that the ALJ's residual functional capacity assessment is supported by proper legal

26  reasoning and substantial evidence in the record.  Specifically, the court finds no error with

respect to the weight the ALJ gave to Dr. Bellomo's opinion or the credibility assigned to plaintiff's testimony.  Therefore, the first hypothetical accurately described plaintiff and the ALJ disability determination is supported by the vocational expert's testimony that a person described in this hypothetical could perform plaintiff's past relevant work.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 26) is denied;

2.      Defendant's cross-motion for summary judgment (Doc. 29) is granted; and

3.      The Clerk of the Court is directed to enter judgment and close this file.


DATED:  September 25, 2009

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE